UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

MICHAEL GROSS, et al.,

        Plaintiffs,

v.                                                                              Case No. 04-C-287

THE FOND DU LAC COUNTY
AGRICULTURAL SOCIETY INC., et al.,

        Defendants.

**DECISION AND ORDER**

Plaintiff Michael Gross ("Gross"), along with his wife Jan, as parent and next friend of his four minor children, filed this action under 42 U.S.C. § 1983 against the Fond du Lac County Agricultural Society (the "Society") and the individual members of its board of directors after he was notified by the Society that he and his family would be barred from exhibiting or selling their livestock at the 2004 Fond du Lac County Fair (the "Fair") and from selling their livestock at the Fair for the following four years. Thereafter, the Gross family was to be on probation on a year-to-year basis. Gross claims that the sanctions amount to a deprivation of property or liberty without due process of law and seeks damages and attorney's fees.

The case is presently before me on the defendants' motion for summary judgment of the federal claim against them.[1] Because I conclude that the plaintiffs have failed to demonstrate that

---

[1]A state defamation claim is also brought against one of the defendants, but that claim is not at issue here.

a genuine issue of material fact exists concerning the Society's deprivation of their constitutionally protected liberty or property rights without due process of law, the defendants' motion for summary judgment will be granted.

**I. BACKGROUND**

Michael Gross owns and operates a livestock farm located in Fond du Lac County (the "County"), on which he and his family raise pigs, cattle, and other livestock. Gross also teaches animal husbandry at the middle and high schools for the School District of Oakfield. Gross and his children regularly exhibit livestock at the Fair and various other fairs in the area. As part of his teaching job, Gross also works with students who exhibit their livestock at the Fair. (Decl. of Michael Gross ¶¶ 5, 8.)

The Fond du Lac County Agricultural Society is a private, non-profit corporation registered with the State of Wisconsin. Among the purposes for which it was formed is to "conduct such exhibitions, fairs and events consistent with the educational interests and needs of people in Fond du lac County and the members of the society." (Ex. 55, ¶1.02(c).) Pursuant to that goal, and every year, the Society puts on the Fair at the County fairgrounds.

On February 23, 2004, Gross was notified by the attorney for the Society that he and his family were to be banned from exhibiting livestock at the Fair for one year and from selling livestock for five years because of ethical violations. At that time, the stated reason for the sanction was that Gross had violated the rules governing the Market Hog Average Daily Gain contest (the "contest"), junior class, at the 2003 Fair.

The purpose of the contest is to determine which pig has the highest average daily weight gain over a 100-day period; as such, the contestants are required to bring their animals to an initial "weigh-in," approximately 100 days before the Fair, where the animals' weights are recorded and their ears tagged for identification. Presumably, the animals spend the remaining days before the Fair back at their owners' farms. When the animals are finally shown at the Fair, their final weights are recorded and their average daily weight gain is determined. The pig with the highest average daily gain is declared the winner, and its exhibitor receives a token monetary payment called a premium. Historically, the winning animal also fetches a higher price at the Meat Animal Sale, which is also held during the Fair. (Ex. 52 at 23.)

According to the letter from the Society's attorney advising Gross of the sanctions, Gross had admitted to a number of members of the Society's Livestock Committee that he had placed on the ears of several other pigs he owned tags that were duplicates of the tag placed on the pig that his son weighed in for the contest at the Fair. The letter also stated that Gross had admitted notching the ears of the other pigs to match the notches in the ears of the pig entered in the contest. "This violation," the letter stated, "allowed the showing of the best from the group, rather than the designated animal," an action that the Livestock Committee determined "was a clear violation of the rules and gave [Gross] a substantial advantage over the other participants." (Ex. 8.)

The sanctions were the culmination of an investigation that was triggered when questions were raised shortly after Gross's son, Andrew, won first place in the contest for the 2003 Fair with an average daily weight gain of 2.46 pounds. (Ex. 5.) Gross claims that John Posthuma, whose child had also entered a pig in the contest, complained that no pig could have achieved that rate of gain and accused Gross of switching pigs. (Gross Decl. ¶ 19.) Because of the accusations, the

3

checks that Gross's children were to receive for the Meat Animal Sale were initially withheld. After further consideration, however, the Livestock Committee voted to give the children their checks. (Gross Decl. ¶¶ 22-23.)

Although no written complaint was ever filed with the Species Chairperson for the Fair, the Livestock Committee decided to investigate the charge that Gross had switched pigs. On September 17, 2003, Gross became aware that the Livestock Committee was going to meet to discuss the matter. Michael Rankin, a University of Wisconsin Extension Agent who served in an advisory role to the Livestock Committee, recommended that Gross not attend the meeting. Rankin stated in an email sent to Gross that it was his hope to let everyone have their say and then move on to 2004. He told Gross that he hoped to avoid a confrontation. (Gross Decl. ¶ 28; Ex. F.) As Rankin suggested, Gross did not attend the September 17th meeting.

The following day, Gross called Livestock Committee member Dan Robinson to find out what had happened. He was told the Committee had voted to recommend that sanctions be imposed against Gross and his family. Gross received no formal notice of the Committee's action, however. On October 1, 2003, Gross attended a meeting of the Society with his sister, who brought with her a tape recorder. Gross told the Society that no one had informed him of the basis of the Livestock Committee's recommendation for sanctions and that no written complaint had been filed against him. Even though no one present would advise Gross what he was accused of doing, he assumed it was the charge that he had switched pigs at the Fair. Gross denied that he had switched pigs or broken any rules or regulations. He claimed he had a defense and vowed he would fight the allegation that he had cheated. Defendant Richard Martin, president of the Society, told Gross that

4

the Society would not be making a decision that night, because it needed more information. (Ex. 34.)

Two weeks later, on October 15, 2003, the Society held a special meeting to address the matter. Neither Gross, nor his attorney, were told of the meeting or asked to be present. After "a lengthy discussion," a motion was passed, subject to advice of the Society's attorney, to ban the Gross family from showing livestock at the 2004 Fair and to ban them from selling livestock at the Fair for the next five years. Gross was also banned from serving on the Market Livestock Committee. (Ex. 4.) Gross received no notice of the Society's action until the February 23, 2004 letter from the Society's attorney, which referred to action taken by the Society at a December 10, 2003 meeting. (Gross Decl. ¶ 35; Ex. 8.)

On March 23, 2004, Gross, along with his wife and children, filed this action. Plaintiffs sought and were granted leave to conduct expedited discovery, and on May 14th, they filed their Motion for Preliminary Injunction in the hopes of preserving their right to participate in the upcoming Fair. To that end, and in the course of the hearing on that Motion, Gross proceeded to present evidence intended to establish the foregoing events and to prove that he did not switch pigs at the 2003 Fair. The Society defended its action, however, not on the ground that Gross had cheated at the Fair, but that he intended to cheat at a later fair that was to be held in Alto, a small town in the western part of the County. In particular, the Society offered into evidence portions of the transcripts of depositions of several witnesses who testified that Gross had admitted to them that he had notched the ears of several pigs that were entered into the Alto Fair so that they matched the pigs his children had entered into the Fair. While not conceding that Gross did not also violate the

5

rules of the Fond du Lac County Fair, it was his conduct relating to the Alto Fair, the Society contended, that justified its decision to impose the sanctions against the Gross family.

Wholly aside from the question of whether the sanctions were justified, however, the Society also argued that the § 1983 claim against it and the members of its board of directors must fail because they were not acting under color of state law at the time they imposed them. When I denied the plaintiffs' motion for preliminary injunction in a Decision and Order dated July 2, 2004, it was on that basis. In addition, however, the Society asserted that even if it were acting under color of state law, Gross failed to demonstrate that he had any liberty or property interest in being able to show and sell livestock at the Fair or that the process afforded by the Society was constitutionally insufficient. The Society argues that summary judgment is now proper based on all, or any, of these reasons.

Gross, on the other hand, denies that he ever made the admissions that the Society's witnesses attributed to him and denies that he ever duplicate-notched any of his own pigs in an effort to cheat at either the Alto Fair or the Fond du Lac County Fair. Rather, he claims that any duplicate-notched pigs were the product of his activities as a teacher of animal husbandry. In particular, Gross contends that he dedicated a litter of pigs for use by his students in practicing ear notching. (2nd Amended Compl. ¶ 28.) Per his instructions, his students copied the notching of some of the Gross pigs onto the ears of pigs in the dedicated practice litter; as such, a number of Gross' pigs had identical markings. (Id.) According to Gross, it is the Society's failure to solicit this explanation from him prior to imposing sanctions upon the Gross family, combined with its failure to inform Gross of the charges against him, that deprived the plaintiffs of their constitutionally guaranteed due process rights.

6

At the preliminary injunction stage, I concluded Gross was unlikely to succeed in demonstrating that the Society was a state actor, and that issue has become the focal point of the present motion for summary judgment. The plaintiffs have proffered 99 pages of facts, most geared towards establishing a continuing connection between the County and the Society, tracing the relationship between the County and the Society from the recording of the Society's Constitution and By-Laws in 1903 all the way to the present. (Pl. PFOF ¶¶ 8-552.)

Among other things, the plaintiffs point out that the Society has scheduled its meetings to be more convenient for County Board members, (Id. ¶¶ 66, 73, 81, 83, 87, 90), had funds appropriated for its use by the County, (Id. ¶¶ 70-72, 74), and–at least until roughly 1970–granted the County the power to elect its Secretary (Corris Decl.). Additionally, plaintiffs point to a provision in the Society's current By-Laws, which establishes a maximum quorum of 50 members, as proof of the County's control over, and identity with, the Society. Specifically, because all 36 of the County Supervisors are automatically considered voting members of the Society, plaintiffs contend that the By-Laws' maximum quorum provision "gives the supervisors the ability to exert majority control" over the Society. (Pl. Brief at 8.) Indeed, plaintiffs point out that, "[f]rom 1993 through . . . 2002, virtually every motion made and seconded at the annual meeting of the Ag Society, was made and seconded by County Board Supervisors." (Id. at 9; Pl. PFOF ¶ 63.)

Furthermore, the plaintiffs point to the fact that the County listed the Fair as one of its departments on its website and included the Society in its Directory of Public Officials as additional proof of the relationship between the County and the Society. (Pl. PFOF ¶¶ 4, 477-79.) Likewise, the plaintiffs assert that the Society's receipt of insurance coverage and legal fees from the County further confirms the identity between the two. (Pl. Brief at 15-17.)

7

Concerning the defendants' individual liability, the plaintiffs assert that their receipt of per diems from the Society precludes their status as volunteers. (Id. at 17.) In other words, because the Society acted under color of state law, the defendants–who received per diems from the Society and served as its directive authority–also acted under color of state law.

Finally, the plaintiffs attempt to bolster their argument that the Society and County are intertwined by highlighting the County's incentives to control the Society's actions. In particular, the plaintiffs point out that, because the Society runs the Fair, and the Fair is an important public function to the County, the County has a vested interest in the Fair's management. (Id. at 19-20.) To that end, the County contracts with the University of Wisconsin Extension Office (the "UW Extension Office") for Extension Agents to provide services related to the Fair. (Id. at 20.) This relationship between the County and the UW Extension Office concerning the Fair, plaintiffs contend, further demonstrates the close connection between the County and the Society.

Gross contends that the consequences of the Society's sanctions will be devastating. He notes first that his family will suffer a direct and substantial monetary loss. Gross testified that the price paid for animals sold at the Fair is significantly higher than can be obtained on the open market. He calculated the difference between the amount of money his family received from the sale of animals at the Fair over the past four years and what they would have been paid on the open market at more than $20,000. (Ex. 54.) And, of course, the right to exhibit the animals they have raised on their farm at the annual Fair and compete with area farmers for prizes is the culmination of the efforts he and his children have expended throughout the year. The loss of this opportunity, while not easily quantified, is significant.

8

Gross further contends that the indirect consequences likely to flow from the Society's actions are even more serious. The disqualification of his family from participation in the Fair constitutes grounds for disqualification in other fairs and competitions across the state. Likewise, because his job requires that he assist students who exhibit animals at the Fair, Gross testified to concerns over his continued employment. Finally, the fact that his children will be unable to compete at the Fair will adversely impact their ability to participate in organizations such as Future Farmers of America ("FFA") and to obtain jobs and scholarships in the area of agriculture. Given the magnitude of these consequences, plaintiffs argue they were entitled to more process than they received. At a minimum, they claim, they should have been informed of the charges against them and given an opportunity to explain their actions.

It is with these facts in mind, then, that I must consider whether plaintiffs have demonstrated the existence of a genuine issue of material fact concerning: (1) whether the Society was acting under color of state law when it sanctioned plaintiffs; (2) if so, whether the sanctions deprived plaintiffs of a constitutionally protected liberty or property interest; and (3) if so, whether the process employed by the Society in administering the sanctions was sufficient. Because I find that the Society and its directors were not acting under color of law, the plaintiffs' § 1983 claim must be dismissed.

## II. ANALYSIS

Summary judgment is proper where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R.

9

Civ. P. 56(c). "Simply put Rule 56(c) mandates an approach in which summary judgment is proper only if there is no reasonably contestable issue of fact that is potentially outcome-determinative." *E.E.O.C. v. Sears, Roebuck & Co.,* 233 F.3d 432, 436 (7th Cir. 2000). "In determining whether a genuine issue of material fact exists, courts must construe all facts in the light most favorable to the non-moving party and draw all reasonable and justifiable inferences in favor of that party." *Tesch v. County of Green Lake,* 157 F.3d 465, 471 (7th Cir. 1998). Notwithstanding that fact, "a party will be successful in opposing summary judgment only when they present definite, competent evidence to rebut the motion." *Smith v. Severn,* 129 F.3d 419, 427 (7th Cir. 1997) (citation omitted).

**1. State Action**

42 U.S.C. § 1983 imposes civil liability upon one "who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws [of the United States]." As such, to prevail on a § 1983 claim, a plaintiff must prove: (1) that he was deprived of a right secured by the Constitution or laws of the United States, and (2) that the deprivation was visited upon him by a person or persons acting under color of state law.

The requirement that state action be demonstrated "preserves an area of individual freedom by limiting the reach of federal law and federal judicial power." *Lugar v. Edmondson Oil Co.*, 457 U.S. 922, 936 (1982). Likewise, it "avoids the imposition of responsibility on a State for conduct it could not control." *NCAA v. Tarkanian*, 488 U.S. 179, 191 (1988). Thus, § 1983 jurisprudence

seeks to "plot a line between state action subject to Fourteenth Amendment scrutiny and private conduct . . . that is not." *Id.*

The most recent articulation of the state action requirement comes from the Supreme Court's treatment in *Brentwood Academy v. Tennessee Secondary School Athletic Association*, 531 U.S. 288 (2001). In that case, the Court reiterated "that state action may be found if, though only if, there is such a 'close nexus between the State and the challenged action' that seemingly private behavior 'may be fairly treated as that of the State itself.'" *Id.* at 295 (quoting *Jackson v. Metropolitan Edison Co.*, 419 U.S. 345, 351 (1974)). "What is fairly attributable," however, "is a matter of normative judgment, and the criteria lack rigid simplicity." Id. As such, "no one fact can function as a necessary condition across the board for finding state action; nor is any set of circumstances absolutely sufficient, for there may be some countervailing reason against attributing activity to the government." *Id.* at 295-96. Rather, the Court said, prior "cases have identified a host of facts that can bear on the fairness of such an attribution." *Id.* at 296. For example, "a challenged activity may be state action when it results from the State's exercise of 'coercive power,' . . . when the State provides 'significant encouragement, either overt or covert,' . . . or when a private actor operates as a 'willful participant in joint activity with the state or its agents.'" *Id.* (citations omitted). Such examples illustrate scenarios in which the governmental entity is directly involved in the challenged activity; as such, attributing that activity to the governmental entity is reasonable. Additionally, however, the Court noted that it may be appropriate to treat "a nominally private entity as a state actor when it is controlled by an 'agency of the State,' . . . when it has been delegated a public function by the State, . . . when it is 'entwined with governmental policies,' . . . or when government is 'entwined in [its] management or control.'" *Id.* (citations omitted).

11

The question of whether a defendant was acting under color of law is itself a question of law, *Goldstein v. Chestnut Ridge Volunteer Fire Co.,* 218 F.3d 337, 342 (4th Cir. 2000), though of course if facts material to that issue are disputed then summary judgment would not be appropriate. *See also Almand v. DeKalb County,* 103 F.3d 1510, 1513-14 (11th Cir.1997). The plaintiffs focus their efforts on highlighting the general commingling between the County's and the Society's efforts, taking their cue from the "entwinement" theory described in *Brentwood Academy*.[2] The examples of such intermingling were detailed above, but in summary form they involve:

1. the Society's grant of membership to members of the Fond du Lac County Board

2. making Society meetings convenient for County Board members to attend

3. the Society having a maximum quorum of 50 members

4. receipt of funds, insurance and legal fees from the County

---

[2]The plaintiffs also take a stab at arguing the Society was delegated a public function. Notwithstanding the beneficial aspects of the Fair, however, nothing suggests that the putting on of county fairs is a "public function" in the constitutional sense of that term as it is employed in state action determination. Importantly, cases in which state action was found by virtue of the delegation of a public function to a private entity involve much more fundamental, indeed even mandatory, publicly beneficial activities. Cf., e.g., *West v. Atkins,* 487 U.S. 42 (1988) (discussing the provision of health care to prison inmates as a mandatory function of state governments, thus rendering private practitioner's provision of such health care state action); and *Edmonson v. Leesville Concrete Co.*, 500 U.S. 614, 627-28 (1991)(pointing out that, because "the jury system performs the critical governmental functions of guarding the rights of litigants and 'ensur[ing] continued acceptance of the laws by all . . . people,'" peremptory challenges to minority jurors, if allowed, would be rendered state action for purposes of the removed juror's ensuing constitutional discrimination claim).

In other words, "the relevant question is not simply whether a private group is serving a 'public function.' [Rather,] the question is whether the function performed has been 'traditionally the exclusive prerogative of the State.'" *Rendell-Baker v. Kohn*, 457 U.S. 830, 842 (1982) (citation omitted). Thus, the mere fact "[t]hat a private entity performs a function which serves the public does not make its acts state action." *Id*. Rather, it is only those situations in which a private entity has been delegated an exclusive and mandatory function of the government that their actions may be fairly attributed to the State. The plaintiffs have not presented sufficient evidence, nor is it likely they could, to establish that the putting on of fairs is an exclusive and mandatory function of the government.

12

> 5. listing of the Fair on the County's website
>
> 6. the Society being listed in the County's Directory of Public Officials

The first three of these factors suggest some overlap between the County Board and the Society's membership, although a number of reasons suggest that the connection between the two is actually quite attenuated. First, since the Society has more than 1000 voting members, the County Board's *ex officio* representation (36) represents less than four percent of the Society's voting membership. Second, the fact that the Society sought to hold meetings at times convenient for the Board members (assuming that is the case) indicates shared purposes but does very little to suggest shared identity. The fact that it is a matter of mere convenience–because the Board members would already be present for their Board meeting–reduces its significance to the plaintiffs' case. The plaintiffs do not suggest that the Society's meeting is *part* of the Board's meeting, but instead that the Society's meeting only begins when the Board meeting has recessed, something which suggests cooperation but, again, not necessarily a shared identity. Third, the plaintiffs' quorum argument is undeveloped and confusing. They suggest that having a maximum quorum of 50 allows the Board to control the Society, but it is unclear either how this fact would favor the Board's membership (even assuming they voted in a bloc) in the voting or how it would somehow give the Board control over the Society. Instead, as the defendants note, any organization with 1000-plus voting members would need a small quorum in order to function meaningfully. In any event, there is no indication that the quorum requirements have any relation whatsoever to the County Board's involvement. In sum, though there is some element of cooperation, there is little to suggest that these factors portray a "close nexus" of interrelated individuals and activities.

13

The second three of the factors noted above hint at some official County support, but, as with the first three, they come up far short of establishing that the County and the Society were closely related. The Society is now on its third attorney in this litigation, the first two having bowed out because the County's insurance policy did not cover Society members. That earlier attorneys might have taken the position that the County's insurer should cover the Society's legal fees in this matter sheds no light on whether there was actually a "close nexus" between the two entities. Similarly, the fact that "per diems" (however defined) were received by certain people does not suggest any strong nexus. As to the website, it seems the individual responsible for placing the Fair on the County's website simply did so without considering any implications it might have. The Fair's listing on the website was not the result of deliberate action, nor was it meant to confer the imprimatur of the County on the Society itself. One expects that websites, bulletin boards and newsletters of counties all across the country convey information about upcoming events, clubs, organizations, bake sales, and the like, without those events becoming official state activities, even if such are listed erroneously as "departments." Indeed, despite the plaintiffs' extensive efforts to get to the bottom of the website listing issue, the very fact that the website listed was "fonddulaccountyfair.**com**" could cut just as strongly the other way because state entities do not generally have .com web addresses.

Thus, even *in toto*, these facts and the others cited in the plaintiffs' proposed facts do not suggest that there was much overlap between the County and the Ag Society. More importantly, perhaps, the plaintiffs have not connected the various instances of alleged entwinement to any kind of organizing principle relevant to the inquiry at hand. It is true that *Brentwood Academy* suggests a liberal and freewheeling *gestalt* analysis, eschewing bright lines for "normative judgments" and

14

counseling against "rigid simplicity" in favor of "fairness". But *Brentwood Academy* does not mean one can nickel and dime his way to state action by citing a laundry list of examples unrelated either in purpose or time. The evidence of entwinement must instead reflect the underlying goals of § 1983. *"Brentwood* directs courts to focus on the fact-intensive nature of the state action inquiry, mindful of its central purpose: to 'assure that constitutional standards are invoked 'when it can be said that the State is *responsible* for the specific conduct of which the plaintiff complains.'" *Crissman v. Dover Downs Entertainment Inc.,* 289 F.3d 231, 239 (3d Cir. 2002)(en banc)(quoting *Brentwood,* 531 U.S. at 295 (citations omitted)). Thus, for example, the plaintiff does not explain why it would make sense, within the context of § 1983, to hold the state responsible because of a lone directory listing, a website reference, or because a small percentage of the Society's membership was comprised of County supervisors. What is it about these facts, seemingly cherry-picked from the Society's long history, that would make it reasonable to believe the actions complained about here were actually actions of the state? We are not told.

The contrast with *Brentwood Academy* is instructive. There, the court noted that 84% of the athletic organization's members were public school officials and that those officials were acting in their official capacity when working on behalf of the association. Half of the association's meetings took place during school hours. Both the close nexus and the rationale for finding state action were clear: the association's purpose–school athletics–was fundamentally public, its membership was public by a large majority, and the association carried out its duties during school while the public members were receiving their public salaries. 531 U.S. at 299-300.

> In sum, to the extent of 84% of its membership, the Association is an organization of public schools represented by their officials acting in their official capacity to provide an integral element of secondary public schooling. *There would be no*

15

> *recognizable Association, legal or tangible, without the public school officials, who do not merely control but overwhelmingly perform all but the purely ministerial acts by which the Association exists and functions in practical terms.*

*Brentwood Academy* 531 U.S. at 299-300 (italics added). By contrast, there is no indication that the Ag Society would not continue to exist and thrive if the County severed all of its ties to the Society's activities. To the extent there is any nexus at all, it is not a close one. While the plaintiffs have done an impressive job of marshaling the evidence in their favor, it simply does not amount to state action. Accordingly, even making all reasonable inferences from the facts in the plaintiffs' favor, I conclude as a matter of law that the defendants were not acting under color of state law. Because this is a crucial element of a § 1983 case, the plaintiffs' § 1983 claims must be dismissed.

The defendants' motion for summary judgment as to the plaintiff's federal claims is granted, and such claims are dismissed with prejudice. The remainder of the case is dismissed without prejudice.

**SO ORDERED.**

Dated this   6th   day of September, 2005.

s/ William C. Griesbach
William C. Griesbach
United States District Judge